SYLVESTER C. SMITH v. JESSE H. TROMANHAUSER and Others.[1]

December 3, 1895.

Nos. 9549—(76).

**Injury to Employé—Obvious Risks.**

Application of the rule that a master is not liable for an injury sustained by his servant in the course of his employment, when the danger is of such a character as to be as obvious to the servant as to the master.

Appeal by defendants from an order of the district court for Hennepin county, Elliott, J., denying a motion for a new trial. Reversed.

*A. B. Jackson*, for appellants.
*Charles G. Laybourne*, for respondent.

COLLINS, J. This was a personal injury case, in which plaintiff had a verdict. The appeal is from an order denying defendants' motion for a new trial.

Plaintiff was an experienced carpenter, having worked for 10 years upon all kinds of buildings, from the smallest to the largest structures, and also upon bridges. At the time of the accident, he was at work for defendants, with other carpenters, upon a large grain elevator, which was being built of the usual materials, and in the usual manner, by laying two-inch planks flat, one above another, and spiking them together. This work was all done from the inside of the building; the exterior and the interior, or bin, walls being carried up together, as near as was practicable, the bin floors going in place as the points where they were to be located were reached in the course of construction. When the outer and inner

[1] Reported in 65 N. W. 144.

walls were built up about four feet above any of these permanent floors, it became necessary to erect, for the use of the workmen, temporary scaffolds on the inside of each bin, and these scaffolds were raised up as the work on the walls progressed. They were used for the men to stand on, so that they might conveniently lay and spike the planks of the walls, and as a place for the deposit of tools and materials to be used in the work. One man worked regularly in each bin, and, as occasion required, other men assisted him.

On the morning of the accident, plaintiff and one Meyer were in adjoining bins, at work on the walls. Defendants were then requested by the company for which the elevator was being built to make a change in the plans, by placing the floors of the Meyer bin, and others adjoining, some three or four feet lower than had been designed. As the walls were then about three feet above the place where the floors were to go according to the proposed change, and could not be torn down readily, the only practicable way to make the change was to mortise, at the proper places on opposite walls, and then to put in heavy cross beams as floor supports. This could be done by bringing a beam into a bin, inserting one end into a mortise, pushing it through to such a distance as to permit the beam to drop to a level, then inserting the other end in the corresponding mortise in the opposite wall, and pulling the beam into its proper place. Mortises were cut in the walls of the Meyer bin, opening into what was called "Wasson's bin," on one side. This was the condition when several of the men brought one of the beams into the Meyer bin, and called upon plaintiff to help them put it in place. On trying to insert one end in the mortise opening into the Wasson bin, the other end being necessarily elevated to clear the top of the opposite wall, it was found that it could not be pushed in. The beam was then pulled back and laid on the scaffold, on which the men stood, while plaintiff and some of his fellow workmen cut out and enlarged the mortise.

After two or three attempts the end was inserted, but could not be pushed through, principally because of a spike which protruded from the planks above the mortise. The plaintiff then attempted to pry the spike out of the way with a pinch bar, and, while so engaged, one of the defendants came upon the scene. Noticing that there was some obstacle in the mortise, he stepped over into the

Wasson bin, and, when plaintiff had cleared out the mortise as well as he could, except the spike, defendant asked for the bar, saying that he would take that out. Plaintiff handed the bar to defendant, and, quoting his own testimony: "I stood there, and waited until he done his work." When asked "what work," plaintiff replied: "What he saw was needed to be done in the mortise." Referring to the bar, plaintiff was asked by counsel: "After defendant had it, what did he do with it?" The answer was: "Well, I suppose he took the spike out, because that is what he wanted with it. He said, 'Give me that bar.'"

While defendant was at work with the pinch bar, one end of the beam rested upon the top of the opposite wall, while the other, as before stated, had been inserted into the mortise. Plaintiff and his associates stood on the temporary scaffolding, while defendant remained in the Wasson bin. One man then attempted to push the beam into the mortise, by using a long-handled chisel at the end on the wall. Defendant, observing that the attempt was unsuccessful, handed the bar back to plaintiff, directing him how to use it at the wall to push the beam. The latter took the bar, and applied it to the end resting on the wall without result. A second application moved the beam a little, and the third caused it to slip quickly into the mortise to such a distance that the other end dropped upon the scaffold, breaking it down, whereby the men were thrown about 30 feet, to the permanent floor below; plaintiff receiving the injuries complained of. We have detailed the facts quite minutely, that the exact situation and circumstances might be understood.

Counsel for appellants contends that, irrespective of all questions of negligence on the part of either plaintiff or defendants, all the dangers from which the accident resulted were so apparent and obvious to the plaintiff that he must be held to have assumed the risk; and we quite agree with him. The plaintiff was an experienced workman, necessarily accustomed to handling timbers of all sizes and weights. He knew that one end of this beam, which was very heavy, rested upon the top of the wall, the other, considerably lower, resting upon the edge of the mortise, into which it was designed to slip, and to such a distance as to allow the other end to be brought down clear of the wall, so that, upon being pulled back, both ends could be securely tenoned into opposite mortises. He knew that the spike was

the only remaining obstacle, for he had removed all others, and that, with the spike out of the way, the lower end of the beam would, it was expected, slip into the mortise, and he also knew that, if the aperture was sufficiently large, it might slip far enough to pull the other end off from the wall; the inevitable result being, unless precautions were taken, that the beam would drop with great force and weight upon a scaffold not erected to resist such a falling body. The plaintiff knew, further, that no one was holding the beam so that it could not fall upon the scaffold, and that it was not supported or held in place by ropes or blocks, or any other appliances. The danger to be apprehended if the beam should easily slip into the mortise was perfectly plain.

The negligence complained of by plaintiff seems to be that the defendant who handed him the pinch bar, with directions how to use it at the elevated end of the beam, should have told him that the spike was removed, or should have caused the beam to be held or fastened up so that it could not fall upon the scaffolding; and upon his cross-examination plaintiff would not admit that he knew that the spike had been pried away, so that it no longer obstructed the entering of the beam. From his answers to counsel's questions, as to what he knew about the spike, plaintiff appears to have been of the impression that knowledge as to its removal could not be attributed to him, unless from where he stood on the scaffold in the Meyer bin he could see that it had been removed; and, as he could not actually see into the aperture, because of the beam, his knowledge of what had transpired could not be established.

As we have seen, the risk growing out of a failure to support the beam so that it could not slip from the wall was apparent, and plaintiff might as well claim that he did not know that one of the defendants was over in the Meyer bin, with the bar in his hands, because he could not see him, as to insist that he knew nothing of the removal of the spike, because he could not actually see that it had been removed. He knew that one of the defendants, standing in the Wasson bin, had called for the pinch bar, and had received it from his hands, for the express purpose of removing the spike. He admitted, when testifying, that he stood and waited for defendant to do the work for which he took the bar, and, also, that he supposed defendant had taken out the spike before the bar was handed back, with

directions to apply it to the beam where it rested on the wall. It was conclusively established by plaintiff's testimony that he well knew that the spike was no longer in the way. Knowing the fact, there was no reason why he should be informed of it, verbally or otherwise.

Plaintiff's counsel seems to think that it was incumbent upon the defendant, who used the bar, if he would escape a charge of negligence, to notify the plaintiff that the beam would "go easy now," before giving orders to pry upon the end. But plaintiff, knowing that the spike had been removed, was better posted as to the ease with which the beam would enter the mortise than was the defendant. The close attention of the former had been given to all of the obstacles, while that of the defendant present had been directed to the spike only. The mortise had been trimmed out and enlarged by plaintiff and other workmen two or three times before defendant arrived at the place. None of the dangers to be apprehended were concealed, but all were open to the observation of the men, and were actually known to plaintiff. He admitted full knowledge of the situation, while testifying, except as to the spike; and, in respect to this, it is evident that he knew all that had been done. The plaintiff saw, and must have appreciated, the dangers incident to the work itself, and the way it was being performed, quite as well, if not better, as the defendant who was present. So plain was the proof of his knowledge, and so obvious was it that he assumed the risks, that there was no question for the jury as to his knowledge or assumption of risks.

It was not charged in the complaint that the scaffolding on which the beam fell was improperly or negligently constructed. The negligence relied on by plaintiff was not based on any allegations of this character; but, under the proposition that defendants were bound to furnish a safe place for plaintiff to work in or upon, counsel argues that it was incumbent upon the former to erect a scaffold which would sustain a falling beam of the size and weight of the one in question. If it was expected that beams would fall upon the scaffolding, there might be something in the argument, but this scaffold was not built for the purpose of resisting and holding up falling beams. It was constructed, as plaintiff knew, as a temporary flooring, upon which the men could stand while working, and on which they could

place their tools and their materials, and its strength and stability for these purposes was not questioned.

We need not discuss other questions raised by counsel. On the uncontradicted testimony, defendants should have had a verdict.

Order reversed, and new trial ordered.